**SEGRETS, INC., Plaintiff,**

v.

**GILLMAN KNITWEAR COMPANY, INC., Defendant.**

No.  Civ.A. 94–12015–MBB.

United States District Court, D. Massachusetts.

Aug. 12, 1998.

Eric Jaeger, Ropes & Gray, Boston, MA, Kurt S. Kusiak, Todd & Weld, Boston, MA, for Segrets, Incorporated, plaintiff.

Daniel E. Rosenfeld, Warner & Stackpole, Boston, MA, Donald J. Mooney, Jr, Benesch, Friedlander, Coplan & Aronoff, Cincinnati, OH, for Gillman Knitwear Co., Inc., defendant.

## MEMORANDUM AND ORDER

BOWLER, United States Magistrate Judge.

Plaintiff Segrets, Inc. ("Segrets") filed this action against Gillman Knitwear Company, Inc. ("Gillman") on October 6, 1994. Count I of the three count original complaint alleges a violation of the Copyright Act, 17 U.S.C. §§ 101 et seq. ("the Copyright Act"), and counts II and III allege violations of The Lanham Act, 15 U.S.C. § 1125(a). The controversy depicted in the original complaint stems from Gillman's production and distribution of a sweater vest under the name of Christie (the "Christie I sweater"). Thereafter, Segrets amended its complaint to allege additional counts for copyright infringement and violation of the Lanham Act due to Gillman's production and distribution of a cardigan sweater under the name of Charro (the "Charro sweater").

Segrets, a company which designs, manufactures and markets women's clothing, holds a number of copyrights on its designs. One such copyright is for the fabric design entitled the Blanket Stitch Vest Style # 736033 (the "Blanket Stitch design") which generated a sweater vest under the same name (the "Blanket Stitch sweater"). Segrets submits that Gillman's Christie I sweater and a subsequent modification, denoted the Christie II sweater, infringe its copyrighted Blanket Stitch design.

Segrets also holds a copyright for a fabric design entitled the Primitive Patterns Cardigan # 126134 (the "Primitive Patterns design") which generated a cardigan sweater under the same name (the "Primitive Patterns sweater"). Segrets contends that Gillman's production and distribution of the Charro sweater in-

fringes its copyrighted Primitive Patterns design.

In response to a September 6, 1996 Order issued by the district judge, Segrets characterized the Lanham Act claims as duplicative of the copyright infringement claims. Segrets further stated that if the court allowed its summary judgment motion and its request for statutory damages and attorneys' fees, then Segrets would waive the Lanham Act claims in the amended complaint, counts III through VI. After the district judge partially allowed the summary judgment motion, the parties proceeded to trial on the copyright infringement claims, i.e., counts I and II of the amended complaint. Segrets also did not object to Gillman's proposed finding that there was no evidence of customer confusion as to the source of the Christie II and Charro sweaters. In light of this court's resolution of the copyright claims, Segrets is ordered to advise this court on or before August 21, 1998, as to the status of counts III through VI of the amended complaint.

On September 26, 1996, the district judge issued an oral ruling on Segrets' motion for summary judgment and, thereafter, a written decision. With respect to Count I for copyright infringement of the Blanket Stitch design and Count II for copyright infringement of the Primitive Patterns design, the district judge allowed summary judgment on the issue of the validity of the copyrights. Under Count I, the district judge also allowed the summary judgment motion on the issue of: (1) Gillman's actual copying of the Blanket Stitch design in its Christie I and Christie II sweaters; and (2) the substantial similarity of Gillman's Christie I sweater and the Blanket Stitch design. Under Count II, the district judge allowed the summary judgment motion on the issue of Gillman's actual copying of the Primitive Patterns design in the Charro sweater but denied the motion as to the substantial similarity of the Charro sweater and the Primitive Patterns design.

Issues remaining for trial on the copyright infringement counts primarily include: (1) the substantial similarity of the Christie II sweater and the Blanket Stitch design; (2) the substantial similarity of the Charro sweater and the Primitive Patterns design; (3) the wilfulness of Gillman's infringement, if any, of the Blanket Stitch design and the Primitive Patterns design; (4) the amount of statutory damages, if any;[1] and (5) the amount of attorneys' fees and costs, if any. During a three day bench trial, this court heard testimony from the following witnesses: Dorian Lee Lightbown ("Lightbown"), Senior Design Director of Knitwear at Segrets; Theresa Chang ("Chang"), Production Manager for Gillman; William Gillman, President of Gillman; Sigred Olsen ("Olsen"), Creative Director at Segrets as well as the founder of the company; Julie Smith ("Smith"), primary designer for Gillman's women's line of clothing in the 1990s until her departure from Gillman in the fall of 1996; Steven J. Kandrac ("Kandrac"), Senior Vice President and Chief Financial Officer at Segrets; and Professor Margaret Voelker–Ferrier ("Gillman's expert"), Associate Professor of Design at the University of Cincinnati.

### FACTUAL HISTORY

Segrets, a Massachusetts corporation, designs women's clothing and owns the copyrights to the Blanket Stitch design and the Primitive Patterns design. Lightbown, together with Olsen, created both the Blanket Stitch and the Primitive Patterns designs.

In 1992 Lightbown began the process of designing the Blanket Stitch sweater. Using her interpretation of a southwestern theme, she sketched the sweater line for line.[2] She does not, however, consider color as part of her designs.[3]

---

1. Segrets elected to recover statutory damages under 17 U.S.C. § 504(c).

2. Segrets invests a significant amount of money to create original designs. Segrets' design-

Contrary to Lightbown's belief, however, this court finds that color comprised part of the Blanket Stitch design as well as part of the Primitive Patterns design. In general, color forms part of the design process to create a piece of women's clothing. It is important to female consumers in deciding whether to purchase an item of clothing. Color changes the appearance of a garment, sometimes dramatically. As noted by Smith, a person will not even look at a pattern if the color is poor or incorrect.

In creating a design, Olsen, who typically chooses the colors employed in Segrets' sweaters, testified that the design is drawn on a piece of paper "and then its colored." Olsen chose the colors for the Blanket Stitch and the Primitive Patterns designs. She also stated that, "My part of the design is selecting colors."

In addition to the foregoing, color is an integral part of the Blanket Stitch design because it serves to distinguish and define the rows and patterns therein. Likewise, color serves to distinguish the rows and to create the marled look of the Primitive Patterns design. Moreover, the Blanket Stitch sweater was part of a color coordinated line of clothing.[4] Similarly, the Primitive Patterns design formed part of a color coordinate line of clothing thereby indicating the importance of color in the garment's design. Finally, as required, see 37 C.F.R. § 202.21(a) (1997), Segrets attached a color photograph of the Blanket Stitch sweater and the Primitive Patterns sweater to identify the copyrighted works as part of its copyright applications.

For the fall 1993 season, Olsen chose the colors for the Blanket Stitch sweater. The primary color is a deep blue with different shades of blue, brown, tan and white along the horizontal lines of the design. Segrets began selling the Blanket Stitch sweater in the summer or fall of 1993 at a wholesale list price of $39.[5] After the fall of 1993 Segrets sold an embellishment of the Blanket Stitch sweater, done primarily in purple and peach colors, exclusively to Orvis, a well known chain of retail stores.

In creating the Christie I sweater, Smith initially purchased the Blanket Stitch sweater and brought the sweater back to her office. She also sent the sweater to Gillman's overseas manufacturer in order for the manufacturer to create a sample.[6] Except for the colors, the

ers generally draw a design on a piece of paper, line for line, which is then colored and copyrighted, if appropriate. Olsen testified that the Blanket Stitch and the Primitive Patterns sweaters were some of Segrets' best selling items.

3. Lightbown also does not consider the blanket stitch appearing along the sweater's edge as part of the design. Although the use of a blanket stitch is not a protected expression per se, the use of the stitch incorporated into a particular pattern with contrasting colors in a sweater with row upon row of patterns and particular stitches creates an overall design which is a protected expression under the Copyright Act.

4. Segrets sold the Blanket Stitch sweater as part of its Route 66 collection, a color coordinated line of women's sportswear for the fall 1993 season. The line was designed to embody a southwestern style of clothing. Although a southwestern theme is not necessarily protected by the Copyright Act, the particular combination of rows with contrasting colors in the Blanket Stitch design, each of which contains specific patterns and stitches, constitutes a protected expression of the idea of emulating a southwestern theme. Similarly, the particular combination of rows in the Primitive Patterns design, each of which contains specific patterns, colors and stitches, constitutes a protected expression of the idea of creating a natural or primitive looking sweater.

5. Segrets sold a total of 13,476 Blanket Stitch sweaters through the spring of 1995.

6. On the first day of the trial, Segrets offered portions of Smith's deposition and Chang's deposition. Gillman did not object to allowing in portions of either deposition except as to particular matters, primarily related to testimony involving another copyright infringement action which Gillman subsequently settled. This court sustained Gillman's objection to Smith's testimony on direct examination as to this other lawsuit. (Transcript, Day One, pp. 100–102). Inasmuch as this court finds

Christie I sweater was a copy of the pattern of the Blanket Stitch sweater. In fact, Smith essentially instructed the manufacturer to make a copy the Blanket Stitch sweater except for the color. According to Smith, at some point in the approval process, William Gillman approved these instructions. Gillman's overseas manufacturer produced 36 samples of the Christie I sweater which, except for the colors, were identical to the Blanket Stitch sweater.[7]

William Gillman first learned of Segrets' copyright infringement claim vis-a-vis the Christie I sweater in April 1994.[8] In particular, by letter dated April 18, 1994, Kandrac notified William Gillman of Gillman's unauthorized use of the Blanket Stitch design in the Christie I sweaters. Having received the copyright infringement notification letter from Segrets, Gillman decided to forego its plans to sell the Christie I sweater.[9] Instead, it modified the design of the Christie I sweater while

ample evidence of wilfulness elsewhere in the record, this court need not and does not consider the existence of the single lawsuit, settled out of court, in the course of assessing Gillman's conduct as wilful or innocent. Thus, this court did not consider Chang's or Smith's deposition or trial testimony on the existence and their knowledge of the other lawsuit. In addition, even if, for purposes of argument only, this court considered the testimony, it would not alter its decision as to the amount of statutory damages. Rather, the lawsuit provides additional support evidencing Gillman's pronounced wilfulness as opposed to manifesting a greater degree of wilfulness.

As to the admissibility of other portions of the depositions of Chang and Smith, to the extent Gillman did not object to the admissibility of the testimony at trial when it was offered, it was, accordingly, admitted, albeit not necessarily relied upon by this court in the course of rendering its decision. It is not clear whether the deponents testified as witnesses designated under Rule 30(b)(6), Fed. R.Civ.P. Although Gillman filed an objection prior to trial (Docket Entry # 71), it waived these objections unless Gillman either referred to these objections at the time the testimony was offered or otherwise made an objection at the time the testimony was offered.

7. Gillman did not sell these 36 samples of the Christie I sweater.

8. By stipulation, the parties agree that Segrets notified Gillman in March 1994 of its contention that the Christie I sweater infringed the Blanket Stitch design. The difference between the March 1994 and the April 1994 notification dates does not effect this court's assessment of statutory damages.

9. By letter dated May 9, 1994, Kandrac explicitly informed Gillman's attorney that continued sales of a modified version of the Christie I sweater after notification constituted wilful infringement. The letter also suggested that Segrets review any derivative garment prior to its manufacture. By letter dated May 11, 1994, Gillman's counsel advised Kandrac that Gillman would not make any garment available to Segrets because Segrets was a competitor. The May 11, 1994 letter also informed Kandrac that Gillman would continue to produce a modified version of the Christie I sweater. The letter additionally referred to Gillman's attempt to negotiate a limited license agreement.

By letter dated August 15, 1994, Segrets' counsel wrote to Gillman's counsel reiterating Gillman's infringing conduct and repeating an earlier request for assurance that Gillman had ceased the distribution and sale of Segrets' copyrighted designs. Notwithstanding testimony from Gillman's witnesses acknowledging the similarities, except for the colors, between the Christie I and the Blanket Stitch sweaters, by letter dated August 19, 1994, Gillman's counsel stated that, Gillman believes it has never infringed upon any copyright of Segrets. The letter also characterized any further correspondence as sanctionable.

In mid–1994 Segrets ordered the Christie II sweater from the Gillman catalogue and determined that Gillman was still marketing and selling an infringing garment. Accordingly, Segrets' counsel wrote another letter to Gillman's counsel dated August 25, 1994. The letter advised Gillman's counsel that the modified sweater, i.e., the Christie II sweater, remained substantially similar to the Blanket Stitch design. The letter also repeated the warning that continued sale of the infringing sweaters constituted wilful infringement. The letter further requested an accounting and assurance that Gillman would cease distributing and selling both the Christie I and the Christie II sweaters.

By letter dated August 31, 1994, Gillman's counsel replied that Gillman never delivered the Christie I sweater to any customer. As to the modified or derivative Christie II sweater, Gillman's counsel stated that it had delivered

retaining the overall look and feel of the Christie I sweater. In fact, Gillman made the modifications with the idea or goal of retaining the overall look and feel of the Christie I sweater which, as noted above, was a copy of the pattern of the Blanket Stitch sweater except for the colors.

In order to modify the Christie I sweater, William Gillman simply instructed Chang to change the sweater so that it was not the same. He did not elaborate upon this cryptic instruction nor provide Chang with any specific guidance. Chang, who is not a designer,[10] made all of the changes to the Christie I sweater in the course of one evening at home after work. She spent a total of two to three hours changing the Christie I sweater into the Christie II sweater. In making the modifications, Chang wanted to keep the same overall look and feel of the Christie I sweater. She instituted more then five changes to the Christie I sweater. Specifically, Chang moved certain buttons, changed a row of squares into arrows and added lines of embroidery to a few of the rows. The overall look of the sweater, however, remained substantially the same. In making the Christie II sweater, Chang did not alter the jacquard design of the Christie I sweater. The majority of the patterns in the rows remained unaltered.

William Gillman approved the modifications which were then sent to Gillman's overseas manufacturers. He testified that he understood that instituting five to seven changes in a garment was sufficient to avoid a copyright infringement claim.[11]

approximately 500 dozen of the sweaters at a price of $16 per sweater. The letter additionally represented that Gillman had no more sweaters in stock and did not intend to sell anymore of the original Christie I sweaters or the redesigned Christie II sweaters. As evidenced by other documents, however, these statements were inaccurate. Requested delivery dates for the Christie II sweaters include: October 1, 5, 10, 11, 17 and 20, 1994; November 1, 1994; and December 6 and 12, 1994. In addition, a Gillman invoice describes a shipment of the Christie II sweater "as 9/25/94." Finally, the August 31, 1994 letter asserted that the Blanket Stitch design was a common Indian pattern which was not the subject of a proper copyright. In light of the originality and the intricacy of the design, however, such an assertion does not detract from the wilful nature of Gillman's conduct.

By letter dated January 3, 1995, Gillman's counsel informed Segrets' counsel that "about ninety-five percent of the [Charro] sweaters" had been shipped to customers. By letter dated March 3, 1995, however, Gillman's counsel corrected the aforementioned statement noting that Gillman had only sold an estimated 40% of the manufacturing run for the Charro sweater. William Gillman testified that he was out of town when he provided the initially incorrect, 95% figure to counsel.

Finally, a September 19, 1994 letter from Gillman's counsel to Segrets' counsel reads, in part, as follows:
    While I recognize that you have a right to litigate your claims, it would seem to me that Segrets' cost of litigating these claims are (sic) likely to far exceed any potential benefit that might be gained. Gillman will make no offer to settle this claim and hopes that you can simply confirm that there will be no further dispute between the parties about a product no longer in circulation.
    Statements made in these letters are not considered for the truth of the matter asserted therein. Rather, these statements are used to indicate the wilfulness of Gillman's conduct. Alternatively, when made by Gillman's counsel, these statements constitute admissions of a party-opponent. See F.R.E. 801(d)(2).

10. At the time, Chang had worked at Gillman for more than 16 years, primarily in Taiwan. While working for Gillman in Taiwan, Chang surveyed the market and negotiated prices for fabric. In the process, she learned how to make a sweater. William Gillman testified that he did not ask Smith to modify the Christie I sweater because she was involved in doing something else at the time.

11. This testimony, as well as the testimony of Gillman's expert, is relevant on the issue of the reasonableness of William Gillman's belief that his garments were not infringing and addresses the issue of wilfulness as opposed to the issue of substantial similarity. Gillman's expert testified that designers in the industry generally apply a so-called "five-change rule." By initiating at least five changes to a garment's design, the designer sufficiently advances his or her design to the point where the design no longer looks like the ancestor garment. In testifying to the

The manufacturer sent Gillman a sample sweater which William Gillman, Chang and Smith all approved. The modifications cost Gillman approximately $10,000.

Gillman not only succeeded in its desire to retain the overall look and feel of the Christie I sweater in the Christie II sweater, but in selling the Christie II sweater Gillman did not change its catalogue which pictured the Christie I sweater. Customers ordering a sweater based on the picture of the Christie I sweater in Gillman's catalogue actually received the Christie II sweater.[12] Gillman did not inform the customers placing catalogue orders that they would receive the Christie II as opposed to the Christie I sweater. Few, if any, of Gillman's customers complained to Gillman that they did not receive what they ordered. The slight modifications which Gillman made to the Christie I sweater therefore did not alter the overall look and feel of the sweater to the ordinary observer.

Gillman produced and sold the Christie II sweater in three color combinations: black, hazelnut and a reddish brown referred to as Tuscan. Smith generally uses colors which will coordinate with clothing items already in a women's wardrobe.

It is customary in the industry for designers to purchase garments in retail stores, paid for by the designers' employer, and to bring the garments back to work for inspiration in creating new and original designs. Designers commonly examine and use existing garments in the process of creating a new and original design. Garments in the existing marketplace therefore provide inspiration for designers to create new designs. Shopping in retail stores as well as reviewing catalogues also allows designers to anticipate trends in the fashion industry. Designers, including Lightbown, also regularly review new issues of the various fashion magazines, such as Vogue, and fashion forecast magazines, such as *Trend Union*.[13] In addition, designers, such as Olsen, may send a garment to an overseas manufacturer in the course of creating a design.

Gillman, however, takes this process a step further. Gillman does not limit the amount of money provided for shopping. At times, Smith will purchase a sweater on a shopping trip and send the sweater to Gillman's overseas manufacturer with instructions for changing the color or texture. Although Smith usually provided Gillman's overseas manufacturer with instructions, she nevertheless acknowledged that sometimes she would send a sweater to the manufacturer and simply tell them to copy the sweater as best they could. Defining the term "knock-off" as taking a more expensive garment and copying it to make a cheaper version, Smith conceded

five-change rule, Gillman's expert explained that designers use the rule so that their design will not look the same as the ancestor garment.

She did not testify that designers use the rule so that their design does not look substantially the same. In addition, Kandrac had never heard of a rule of thumb whereby a manufacturer could avoid copyright infringement by making at least five changes to a garment notwithstanding his six and a half years of experience working at Segrets.

This court finds that the five change rule does not justify William Gillman's conduct which, as noted in the discussion section, this court finds was wilful. His belief that his garments did not infringe Segrets' copyrights was, simply put, neither credible nor reasonable.

12. The fact that the fall 1994 catalogues had been printed and distributed does not excuse Gillman's conduct which militates in favor of a finding of wilfulness. Both Smith and Chang acknowledged the strong similarities between the Christie I and the Blanket Stitch sweaters with the exception of the differences in color. William Gillman, an officer of Gillman, testified at his deposition that, other than the color, the Christie I and the Blanket Stitch sweaters were virtually identical. Picturing the Christie I sweater to advertise the Christie II sweater without advising customers demonstrates that Gillman itself viewed the Christie II sweater as comparable and substantially similar to the Blanket Stitch sweater.

13. Likewise, Gillman subscribed to various fashion forecast magazines.

that the Christie I sweater was a knock-off of the Blanket Stitch sweater. Moreover, Smith was aware that designers copyright their designs in the fashion industry.

Copyright tags are usually sewn inside a sweater. Typically, they appear either at the back of the neck or along the inside side seam. Gillman customarily places its copyright label on the neckline. Segrets customarily sews its copyright notification tag along the sweater's inside side seam.

Both the Blanket Stitch and the Primitive Patterns sweaters had copyright notification tags sewn into the inside side seam. This court finds Smith's testimony that she was unaware of the copyright notification tags until "somewhere in the course of this lawsuit" not credible due to her experience in the fashion industry, her constant contact with Gillman's overseas manufacturer, and her extensive use of both sweaters to create the Christie I and the Charro sweaters.[14]

With the exception of the color, the design of the Christie I sweater is exactly the same as the design of the Blanket Stitch sweater. The rows in both sweaters reflect the same, identical patterns. Consequently, even though they use different colors, the sweaters are substantially similar as a whole to the ordinary observer.[15]

The design of Christie II sweater is also strikingly similar in its overall look to the design of the Blanket Stitch sweater notwithstanding the difference in color. Although the embroidery differs in places, the sequence of each row and the jacquard patterns throughout the sweaters remain almost identical.[16] To the ordinary observer, the overall look of the Christie II sweater and the Blanket Stitch design embodied in the Blanket Stitch sweater is substantially similar. It is only with a close, line by line inspection that minor variations become apparent. The most visible change appears to a row at the vortex of the V-neck wherein a series of embroidered arrows appear in the Christie II sweater in lieu of a series of rectangles in the Blanket Stitch sweater. The differences in the colors of the two sweaters also emphasize certain jacquard patterns in one sweater more than in the other sweater.

In short, Gillman produced and sold a sweater which, to the ordinary observer, was substantially similar to the copyrighted Blanket Stitch design. The ordinary observer would recognize the Christie II sweater as appropriated from the Blanket Stitch design. Unless she set out to detect the differences, the ordinary observer would be disposed to overlook them and regard the aesthetic appeal of the Christie II sweater and the Blanket Stitch design

14. At one point in her testimony, Smith stated that in 1993 she did not find many copyright labels on sweater vests using jacquard patterns. This testimony therefore infers that she had, in fact, looked for copyright labels.

William Gillman testified that he would look for copyright notification tags in the neckline of garments and that, to his knowledge, Segrets was the only manufacturer which listed copyrights on the inside side seam.

15. The district judge previously decided this issue on summary judgment. This court's discussion should not be construed as a revisitation of this issue. Rather, it is helpful in determining the substantial similarity of the Christie II sweater and the Blanket Stitch design due to the similarities between the

Christie I and the Christie II sweaters as well as the wilful nature of Gillman's conduct.

16. Exhibit AA as well as the Christie I and II and the Blanket Stitch sweaters are examples of jacquard patterned sweaters or sweater vests. Jacquard patterns were prevalent in the industry in 1993 and 1994. Although the idea of using a jacquard pattern is not entitled to copyright protection, when a designer designs a particular jacquard pattern and combines it with other jacquard patterns in intricate detail using different or varying stitches with contrasting colors, the designer's own, unique expression of jacquard patterning as a whole is copyrightable. Hence, Lightbown's interpretation or expression of jacquard patterning using various stitches, colors and combinations of rows in the Blanket Stitch design receives copyright protection.

as the same. Not only did Gillman engage in this conduct but Gillman continued to sell the Christie II sweater with knowledge of the infringement allegations.[17]

Segrets discovered the Charro sweater after filing suit in October 1994 and thereafter amended the complaint to include a copyright infringement claim based on the Charro sweater. William Gillman first learned of the infringement allegation vis-a-vis the Charro sweater in the fall of 1994. At that point in time, Gillman was in the process of shipping some of the Charro sweaters to its customers.

Lightbown created the Primitive Patterns design using marled yarns and one or more other garments as inspiration. Like the Blanket Stitch sweater, the Primitive Patterns sweater formed part of a color coordinated line of Segrets clothing which used black, khaki and neutral colors. Olsen chose the colors partly to evoke a primitive or natural as opposed to an artificial feeling. Segrets sold the Primitive Patterns sweater in only one color combination comprising a combination of black and neutral tones.[18]

Using the Primitive Patterns design, Segrets obtained a sample sweater embodying the design. Segrets applied for and obtained copyright protection, attaching a color photograph of the Primitive Patterns sweater to the application.

Segrets sold a total of 1,816 of the Primitive Patterns sweaters in the above noted, single color combination in January and February 1994. The wholesale list price was $54 per sweater.

In creating the Charro sweater, Smith initially purchased the Primitive Patterns sweater in early 1994 and took the sweater back to her office. She also purchased other crochet sweaters with a view to developing garments for Gillman's 1994 holiday season.[19] Smith first envisioned and sketched a design for a sweater vest. She subsequently changed her decision and designed a cardigan which evolved into the Charro sweater. Smith also decided to use three color combinations: stone,[20] blue or chambray and turquoise. The stone color combination is strikingly similar to the selected colors in the Primitive Patterns design.

In the spring of 1994 Smith sent the Primitive Patterns sweater to Gillman's overseas manufacturer to use as a model albeit with additional instructions. Smith acknowledges using the Primitive Patterns sweater to create the overall look and the general feel of the Charro sweater. She instructed Gillman's overseas manufacturer to use the Primitive Patterns sweater as a sample for the yarn and the yarn mixes. On the other hand, she also instructed Gillman's overseas manufacturer to change an area of the stitching to give a more open effect. Smith additionally instructed Gillman's overseas manufacturer to change certain stitches, color patterns and lengths.

Notwithstanding the changes, the design of the Charro sweater is similar to that of the Primitive Patterns sweater. As noted by Lightbown, both sweaters employ a mixing of yarns and different colors to create a contrast. The particular marling used in the Primitive Patterns sweater is unique to the design. Comparing the Charro and the Primitive Patterns sweaters, a number of the same rows are marled in the same manner.

The Charro and Primitive Patterns sweaters also have similar patterns in each row. The most visible difference, howev-

---

17. See footnote number nine.

18. As previously discussed, color forms a part of the Primitive Patterns design.

19. In contrast, as noted above, Segrets sold its Primitive Patterns sweater in January and February 1994.

20. According to Smith, the stone color combination was popular at the time she created the Charro sweater.

er, is two lines of crochet stitching in the Charro sweater which are absent in the Primitive Patterns sweater. The tightness or openness of the stitching also varies as does the length of the two sweaters. Overall, however, the patterns, stitches and shapes employed in a number of rows are similar. Given the intricate detail and the large number of rows in the Primitive Patterns sweater, such similarities produce an overall similarity between the two sweaters. These and other differences, however, preclude a finding of substantial similarity except with respect to the Charro sweater in the stone color combination.

As argued by Gillman, color correctly forms part of the Primitive Patterns design. The similarities between the colors employed in the Primitive Patterns design and the Charro sweater in the stone color combination are pronounced and striking.

Together with the strong similarity in color, the similarities in the form of marling, the patterns in certain rows and the various stitches create an overall impression of substantial similarity to the ordinary observer. Unless the ordinary observer set out to detect the disparities, she would be disposed to overlook them and regard the aesthetic appeal of the Charro sweater in the stone color combination and the Primitive Patterns design embodied in the sweater as the same. Furthermore, the overall effect of the Charro sweater in the stone color combination is such that an ordinary observer would recognize the sweater as appropriated from the Primitive Patterns design.

William Gillman testified at his deposition in May 1995,[21] after amendment of the complaint to include infringement based on the Charro sweater, that Gillman planned to continue selling the remaining inventory of the Charro sweaters but was not giving the sweaters to its sales representatives to sell at the present time. Rather, the earliest Gillman planned to resume giving the Charro sweaters to its sales representatives was November 1995. William Gillman thereafter proceeded to sell the Charro "in-house."

Gillman purchased 304 dozen of the Charro sweaters in the following colors: 1,784 sweaters in the chambray color; 1,499 sweaters in the stone color; and 354 sweaters in the turquoise color. Accordingly, the 125 dozen Charro sweaters purchased in the stone color combination comprised approximately 41% of Gillman's total purchase.

■ Taking a trade discount deduction of $7,833, net sales for the 304 dozen of the Charro sweaters totaled $92,357.[25] Roughly estimating net sales of the Charro sweater in the stone color combination as

21. William Gillman is an officer of Gillman. See Fed.R.Civ.P. 32(a)(2).

25. The above information is taken from financial records offered by Gillman and admitted into evidence at trial. (Ex. I–64–68). Segrets' counsel acknowledged seeing the documents prior to trial.

At various times during the trial, Segrets' counsel complained that it had not received financial information from Gillman. Whether a defendant cooperates in providing financial records is relevant in assessing the amount of statutory damages. See Video Cafe, Inc. v. de Tal, 961 F.Supp. 23, 26 (D.P.R.1997). Other than allegations at trial and in its pretrial briefs (Docket Entry # 69, p. 7; Docket Entry # 46, p. 12), Segrets failed to identify any particular document request, unanswered interrogatory or pending motion to compel. At trial, William Gillman simply testified that he did not know whether Gillman produced records of the number of sweaters ordered in response to a document request.

On the other hand, at his deposition, William Gillman refused to answer a question asking for the amount of Gillman's gross yearly revenues. He also refused to quantify Gillman's annual sales volume. Further, he refused to inform Segrets' counsel of the number of Charro sweaters that Gillman had in its inventory at the time of his May 1995 deposition. Gillman also retains receipts for all its sales and its costs. Having considered such evidence and mindful of the purposes for awarding statutory damages, however, this court in its discretion declines to increase the statutory damages based on Gillman's purported lack of cooperation.

41% of this figure results in net sales of $37,866.

According to records detailing purchase orders as of July 26, 1995, Gillman had sold approximately 180 dozen of the Charro sweaters in the following colors: 65.11 dozen at an average price of $35.33 in the chambray color; 107.07 dozen at an average price of $31.13 in the stone color; and 7.02 dozen at an average price of $35.74 in the turquoise color.[26] Gillman learned of the infringement allegations vis-a-vis the Charro sweater in the fall of 1994. Requested delivery dates for the Charro sweater in the stone color combination include dates in January and February of 1995, after Gillman had knowledge of its alleged infringement. In addition, the number of Charro sweaters in the stone color combination (107.07 dozen or 1,292 sweaters) sold as of July 26, 1995, falls short of the 1,499 total sweaters in the stone color combination which Gillman purchased. It is therefore reasonable to infer that Gillman continued to sell the Charro sweater in the stone color combination after being notified of its infringing conduct.

Documents offered into evidence by Gillman reflect a negative net profit on the Charro sweaters of $5,958. The negative net profit figure includes $74,527 in direct costs,[27] a $924 factor fee, $9,515 in commissions for sales representatives and $13,350 in overhead.

Using documents obtained from Gillman during discovery, Segrets presented evidence of 2,376 Charro sweaters sold by Gillman resulting in revenues of $78,568. Other documents viewed by Segrets and offered into evidence by Gillman summarize the above noted 304 dozen Charro sweaters sold, i.e., 3,648 sweaters. Figures for the number of Charro sweaters sold in the former document fall short of the figures in the latter document by 1,272 sweaters. Multiplying the catalogue listed wholesale price of $40 by the 1,272 additionally noted sweaters, Segrets provided evidence of $129,448 in total revenues for the Charro sweater.[28]

Segrets calculated Gillman's direct costs for the Charro sweater as $74,527. This figure includes transportation costs, direct factory or manufacturing costs to produce the Charro sweater, taxes and agent's commissions. Segrets did not subtract the following items which, as indicated above, Gillman included in the calculations of its expenses: overhead ($13,350);[29] commissions to sales representatives ($9,515); a

26. These sales occurred prior to the closeout sales at lower prices.

27. The $74,527 in direct costs includes costs for agent's commissions, direct factory costs, taxes and transportation costs.

28. The latest requested delivery dates for the 2,376 Charro sweaters is March 1, 1995. (Ex. 18 & 19). In light of the 194 dozen Charro sweaters sold by August 1995 reflected in exhibit I-2, it is more likely than not that the remaining 1,272 Charro sweaters were sold after the initial season. It is also more likely than not that a number of these Charro sweaters were sold in the stone color combination. As is typical of the industry, garments left over from a previous season are often sold at a discount. Where, as here, approximately one third of the Charro sweaters remained unsold after the holiday season, a typical discount in the industry for such garments would range from 35% to 40%. Accordingly, it would be customary in the industry to sell the remaining 1,272 Charro sweaters for a price of approximately $24. Selling the remaining 1,272 for a price of $24 yields a total revenue of $109,096 ($78,568 + ($24 × 1,272)) which more closely approximates Gillman's $100,190 figure for total revenues (Ex. I-2), albeit without the trade discount. Taking 41% of the $109,096 figure as roughly approximating the revenue attributable to sale of the Charro sweater in the stone color combination results in revenues of $44,729.

29. Overhead would include employee salaries, such as the salaries of Chang and Smith, the cost of shopping trips by designers such as Smith, and travel to an overseas manufacturer. There was evidence that Segrets' overhead costs constitute 25% of the cost to manufacture an individual item. According to Kandrac, he could not recall any document provided by Gillman which identified the manner of allocating overhead to the production of the Christie II or the Charro sweaters. On the other hand, exhibit I-3 through I-5, admitted into evidence, sets forth various

factor fee or financing cost ($924); and a trade discount ($7,833) consisting of an allowance provided to customers.[30] Using Segrets' calculations, Gillman's net profit on the Charro sweater totaled $54,921. Forty-one percent of this figure yields an estimated net profit on the Charro sweater in the stone color combination of $22,518.

Gillman purchased 624 dozen of the Christie II sweaters in the following colors: 3,445 sweaters in the hazelnut color; 3,218 sweaters in black; and 824 sweaters in the color referred to as Tuscan. Gillman's financial documents show net sales of $116,127, taking into account a trade discount of $3,164, and a negative net profit of $8,862. The negative net profit results from subtracting direct costs in the amount of $98,362,[31] a factor fee in the amount of $1,161, commissions for sales representatives in the amount of $9,282 and overhead in the amount of $16,183.

Using documents obtained from Gillman during discovery, Segrets presented evidence of 3,462 Christie II sweaters sold by Gillman resulting in revenues of $62,755. Other documents viewed by Segrets and offered into evidence by Gillman summarize the above noted 624 dozen sold of the Christie II sweaters, i.e., 7,488 sweaters. Figures for the number of Christie II sweaters sold in the former document fall short of the figures in the latter document by 4,026 sweaters. Multiplying the catalogue listed wholesale price of $20 by the 4,026 additionally noted sweaters, Segrets provided evidence of $143,275 in total revenues for the Christie II sweater.[32]

items of overhead and apportions the total overhead for the Charro and Christie sweaters based on the percentage of 1994 sales of the Charro and Christie sweaters in relation to the total 1994 sales of the company.

30. Kandrac excluded overhead from the above calculations because, in his view, it represented a fixed cost incurred by Gillman irrespective of the cost of producing and selling the infringing sweaters. He also excluded commissions for sales representatives because the documents supplied by Gillman to Segrets reflected sales commissions for all of the product sold by a particular sales representative. In other words, the documents did not restrict the amount of the commissions to those commissions incurred from selling the infringing sweaters. Likewise, the documents reflecting the factor fee and trade discount did not restrict the fee as related solely to the infringing sweaters, according to Kandrac. Examining the proffered documents, commissions for the Christie sweater, presumably the Christie II sweater inasmuch as Gillman did not sell the Christie I sweater, are as follows, rounded to the nearest dollar: $1,218, $247, $628, $372, $620, $70, $70, $70 and $730. Total documented commissions for the Christie II sweater therefore amount to $4,025. Examining the proffered documents, commissions for the Charro sweater are as follows, rounded to the nearest dollar: $1,265, $650, $82 and $105. Total documented commissions for the Charro sweater therefore amount to $2,102.

Exhibits I–32, I–35 and I–37 fail to identify the sweater or garment invoiced. Commissions noted in exhibits I–32, I–35 and I–37 were therefore not included in the foregoing list.

In light of Kandrac's testimony and this court's examination of exhibit I, this court, in its discretion, does not find sufficient evidence to demonstrate that the factor fee and trade discount costs relate to the Christie II and Charro sweaters in the stone color combination. Nor is there any indication that the $9,515 commissions to sales representatives for the Charro sweater or the $2,102 in documented sales commissions for the Charro sweater relate to sales of the Charro sweater in the stone color combination. See In Design v. Lauren Knitwear Corporation, 782 F.Supp. 824, 832 (S.D.N.Y.1991) (noting, albeit with respect to section 504(b), that "defendant can deduct only those costs which it proves were related to the infringing work"). Thus, the court in Lauren excluded yarn costs contained in certain invoices because "Lauren failed to establish that the yarn reflected in the invoices was actually used to make the infringing sweaters." In Design v. Lauren Knitwear Corporation, 782 F.Supp. at 833–834 & n. 19 (also rejecting summary of costs based on weight as insufficient).

31. This figure, supplied by Gillman, improperly includes $10,000 in redesign costs incurred by Gillman in redesigning the Christie I sweater into the Christie II sweater. The figure also includes direct factory costs, taxes, transportation costs and agent's commissions.

32. With respect to the 3,462 figure of Christie II sweaters, Kandrac did not account for 2,814 Christie II sweaters sold to J.C. Penney

Excluding the redesign costs, Segrets calculated Gillman's direct costs for the Christie II sweater as $87,730. This figure includes transportation costs, direct factory costs to produce the Christie II sweater, taxes and agent's commissions. Segrets did not subtract the following items which, as indicated above, Gillman included in the calculations of its expenses: overhead ($16,183); commissions to sales representatives ($9,282);[33] a factor fee or financing cost ($1,161); and a trade discount ($3,164) consisting of an allowance provided to customers.[34] Using Segrets' calculations, Gillman's net profit on the Christie II sweater totaled $55,545.

Segrets sells its sweaters primarily at the wholesale level to specialty stores and retailers such as Nordstrom or Macy's. Unlike Gillman, Segrets does not sell its clothing to mass merchandisers in the price range of stores such as J.C. Penney. Lightbown, however, testified that she saw both Gillman and Segrets sweaters advertised in the same catalogue. Kandrac also testified that Segrets and Gillman had between 80 to 100 shared customers. In addition, he produced a List of 90 shared customers. For example, Gillman's sales documentation evidences sales of the Charro sweater to both Nordstrom and Orvis, two of Segrets' customers.

Gillman, a family business located in Cincinnati with an estimated 40 employees, sells its sweaters throughout the world, including the United States. In the early 1990s, Gillman sold to small specialty stores and moderate department stores such as J.C. Penney. Gillman's gross revenues for the past two fiscal years average approximately $19,500,000. In 1994 Gillman's gross revenues totaled approximately $15,000,000. There is little, if any, admissible evidence, however, that Gillman's sales of the Christie II sweater and the Charro sweater in the stone color combination negatively effected Segrets' sales of the Blanket Stitch and the Primitive Patterns sweaters.[35]

## DISCUSSION

Section 106 of Title 17 gives a copyright owner a number of "exclusive rights," subject to limitations contained in sections 107 through 118. *Stewart v. Abend,* 495 U.S. 207, 220 & n. 3, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (copyright author holds "bundle of exclusive rights" set forth in section 106). Segrets' exclusive rights include the right to distribute the Blanket Stitch and Primitive Patterns designs to the public for sale. 17 U.S.C. § 106(3). Segrets also has the exclusive right to copy the designs and to incorporate the designs into derivative works. 17 U.S.C. § 106(1) & (2); *Stewart v. Abend,* 495 U.S. at 220 & 221–224, 110 S.Ct. 1750.

To enforce these rights, section 501 authorizes "a cause of action for any infringement." 17 U.S.C. § 501(b); *Motta v. Samuel Weiser, Inc.,* 768 F.2d 481, 483–84 (1st Cir.) (quoting statute), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d

---

for a price of $15 yielding a total sale of $42,210. Gillman's largest customer for the Christie II sweater was J.C. Penney. Although the documents detailing the J.C. Penney sales do not refer by name to the Christie II sweater they identify the color as hazel, one of the three color combinations of the Christie II sweater, and the customer as J.C. Penney.

**33.** Commissions paid to sales representatives typically range between three to seven percent.

**34.** This court does not find sufficient evidence to demonstrate that the factor fee and trade discount costs relate to the Christie II sweater. Adequately documented commissions total $4,025. *See* footnote number 30.

**35.** As Kandrac explained, it is difficult and impractical for Segrets to determine the sales Segrets lost as a result of Gillman's sales of the Christie II and the Charro sweaters. *See Lauratex Textile Corporation v. Allton Knitting Mills, Inc.,* 519 F.Supp. 730, 732 (S.D.N.Y. 1981) (recognizing difficulty of estimating "what the plaintiff's sales would have been had there been no infringement"). Kandrac also testified that selling copies of Segrets sweaters dilutes its brand name irrespective of whether Segrets was selling the original sweaters at the time.

575 (1985). Sections 502 through 505 delineate a number of remedies including statutory damages, which vary in the maximum amount depending on the wilfulness of the infringement, and attorneys' fees. 17 U.S.C. §§ 502–505.

■ In order to prevail on a copyright infringement claim, the "plaintiff must show two elements: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer." *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 6 (1st Cir.1996); *accord Feist Publications, Inc. v. Rural Telephone Service Company*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (copyright infringement requires establishing "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"). The district judge already decided that Segrets owns valid copyrights in the Blanket Stitch and the Primitive Patterns designs. This court finds no reason to revisit this previously decided issue.

■ The second element is twofold. Initially, " 'a plaintiff must first prove that the alleged infringer copied plaintiff's copyrighted work as a factual matter.' " *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1513 (1st Cir.1996) (quoting *Lotus Development Cor-*

*poration v. Borland International, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'g*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996)). In order to accomplish this, a plaintiff may " 'either present direct evidence of factual copying or, if that is unavailable,' " as is typically the case, evidence " 'that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e., probative similarity).' " *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d at 1513 (quoting *Lotus Development Corporation v. Borland International, Inc.*, 49 F.3d at 813). Dissection usually takes place at this juncture [36] and expert testimony is permissible. *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 608 (1st Cir. 1988).

Again, the district judge decided this issue of actual copying of both the Blanket Stitch design and the Primitive Patterns design. In this respect, he expressly concluded that the Christie I and II and the Charro sweaters produced by Gillman resulted from actual copying of Segrets' copyrighted sweaters. In the course of rendering the finding of actual or factual copying, the district judge also dissected

[36]. Dissection entails identifying those aspects in the copyrighted work which constitute the protected expression as distinguished from unprotected ideas or facts. *See Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 608 (1st Cir.1988). It is axiomatic that copyright law extends only to the expression of an idea as opposed to the idea itself. 17 U.S.C. § 102(b). Consequently, " 'infringement is shown by a substantial similarity of *protectible expression*, not just an overall similarity between the works.' " *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d at 1514. In a general way, therefore, dissection allows the court to determine "those aspects of the work that are protected by the copyright and that should be considered in the subsequent comparative analysis under the ordinary observer test." *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608.

Dissection is also useful because the court can "focus on whether and to what extent the

idea is capable of various modes of expression." *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608. The burden of establishing near identity versus a lesser degree of similarity will depend upon whether the idea in the copyrighted work is capable of a limited as opposed to a more infinite number of ways of being expressed. *See Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608.

Finally, dissection involves examining the accused work and comparing it with the identified and protected features in the copyrighted work. "By dissecting the accused work and identifying those features which are protected in the copyrighted work, the court may be able to determine as a matter of law whether or not the former has copied protected aspects of the latter." *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608.

the copyrighted works. This court finds no adequate basis to disturb or revisit these findings.

## I. *Substantial Similarity*

■■ Second, the plaintiff must establish substantial similarity i.e., "that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar." *Lotus Development Corporation v. Borland International, Inc.*, 49 F.3d at 813; *accord CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d at 1513. "Under this second step of the analysis, therefore, the trier of fact applies the 'ordinary observer' test, unaided by expert testimony, to determine whether the copying resulted in substantial similarity between the works." *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608.

■ Furthermore, it is the substantial similarity of the protectable expression which determines actionable copying as opposed to the overall similarity between the two works. *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d at 1514. In applying the ordinary observer test, therefore, the court ignores any substantial similarity or commonality between the two works in the ideas they embody. Accordingly, the idea of creating a sweater in a southwestern design as well as in a jacquard pattern lies outside the realm of copyright protection. The expression of the idea of creating a sweater patterned with a southwestern feel or look, however, is protected. Thus, Segrets' selection and arrangement of particular patterns placed in rows of colors using particular stitches in the Blanket Stitch and the Primitive Patterns designs receives copyright protection and is considered in the course of applying the ordinary observer test.[37]

■ The burden of proof required for a plaintiff to establish substantial similarity will vary depending upon the number of ways in which the idea at issue can be expressed. Where the idea can only be expressed in a limited number of ways, "the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 606–607. Conversely, when the idea is capable of being expressed in "an infinite variety of ways," the plaintiff will bear a lighter burden inasmuch as "duplication or near identity" between the works is not required to establish infringement. *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 607. The "test of appropriation" therefore varies depending on the "amount of creativity in [the] copyrighted work." *Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 607 (paraphrasing *Universal Athletic Sales Company v. Salkeld*, 511 F.2d 904, 908 (3rd Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975)). In the case at bar, there is an infinite number of ways to express the idea of creating a sweater with a southwestern look, a jacquard pattern or a sweater with a natural or primitive look. *See, e.g., Cofre, Inc. v. Lollytogs, Limited*, 1991 WL 40366 at * 3 (S.D.N.Y. March 15, 1991) (noting "there is an infinite number of styles and designs that can be made into a garment for children"). Hence, near identity between the copyrighted designs and the Christie II and Charro sweaters is not required.

The often quoted formulation of the ordinary observer test was initially made by Judge Learned Hand in *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation*,

---

**37.** More explicitly, it is the arrangement and placement of the stitches and patterns into rows of various sizes and widths as opposed to the actual use of a particular stitch which receives protection. *See, e.g., Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. 1328, 1339 (S.D.N.Y.1997) (" '[h]eart' and 'S' shaped motifs are too common to be themselves protectable, although the individualized expression of these elements on the 'Chaklo' carpet and the selection and arrangement . . . is protectable").

274 F.2d 487, 489 (2d Cir.1960), a copyright infringement case involving an ornamental design printed upon cloth. Quoted with approval by the First Circuit in *Concrete Machinery*, Judge Hand's formulation views two works as "substantially similar if 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 607 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation*, 274 F.2d at 489).

The other formulation of the test quoted by the First Circuit in Concrete Machinery "'is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.'" *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 607 (quoting *Educational Testing Services v. Katzman*, 793 F.2d 533, 541 (3d Cir.1986)); *accord Skinder–Strauss Associates v. Massachusetts Continuing Legal Education, Inc.*, 914 F.Supp. 665, 672–673 (D.Mass.1995); *see also Knitwaves, Inc. v. Lollytogs Limited*, 71 F.3d 996, 1002 (2d Cir.1995) (summarizing ordinary observer test in a case involving copyrighted sweater designs as both Judge Hand's formulation and as whether the lay observer would recognize the accused work as appropriated from the

copyrighted work). Cases involving copyrighted sweater or fabric designs employ Judge Hand's formulation, *see, e.g., Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. 1328, 1338 (S.D.N.Y. 1997); *Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.*, 602 F.Supp. 151, 154 (S.D.N.Y.1984), the formulation of the average lay person recognizing the copy as unlawfully appropriated from the copyrighted work, *see, e.g., In Design v. Lauren Knitwear Corporation*, 782 F.Supp. 824, 830 (S.D.N.Y.1991), or simply cite to both formulations, *see, e.g., The Prince Group v. MTS Products*, 967 F.Supp. 121, 126 (S.D.N.Y.1997); *In Design v. Lynch Knitting Mills, Inc.*, 689 F.Supp. 176, 179 (S.D.N.Y.), *aff'g*, 863 F.2d 45 (2d Cir. 1988).[38]

As noted by the district judge, these formulations essentially connote the same standard. (Docket Entry # 65, p. 10). In either event, applying both formulations this court reaches the same conclusion and, thus, need not decide whether one or the other formulation is more apropos to the case at bar.

■■■ In addition, "'The *sine qua non* of the ordinary observer test is the overall similarities rather than the minute differences between the two works.'" *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d at 608; *accord Knitwaves, Inc. v. Lollytogs Limited*, 71 F.3d

---

**38.** The latter two cases also applied the formulations by having the ordinary observer examine the garments from a distance of five to ten feet. *The Prince Group v. MTS Products*, 967 F.Supp. at 126; *In Design v. Lynch Knitting Mills, Inc.*, 689 F.Supp. at 179. "Examining the sweaters at a distance of five to ten feet, and looking at them not with a view to analyzing their design components but simply to comparing the aesthetic impressions that they give, I am unable to conclude that the ordinary observer would overlook the differences if they were not pointed out to her, or would recognize the design of the [accused] sweater as having been appropriated from the [copyrighted] one." *In Design v. Lynch Knitting Mills, Inc.*, 689 F.Supp. at 179.

Significantly, the court in *The Prince Group* further noted, in the context of determining infringement of a fabric design such as in the case at bar, that, "'certain factors are to be given consideration in determining similarity, including (1) size of the elements, (2) pattern, (3) *color* and (4) repetition.'" *The Prince Group v. MTS Products*, 967 F.Supp. at 126 (emphasis added). Likewise, the court in *Knitwaves* viewed color as a consideration in applying the ordinary observer test and determining the substantial similarity of the protected expressions in the copyrighted sweater vis-a-vis the accused sweaters. *Knitwaves, Inc. v. Lollytogs Limited*, 71 F.3d at 1004–1005.

at 1003 (examining the copyrighted sweater design and the accused work's " 'total concept and feel' "); *see also Little Souls, Inc. v. Les Petits,* 789 F.Supp. 56, 59 (D.Mass.1992) (finding no substantial similarity inasmuch as the accused "dolls do not share the look and feel which distinguishes the [copyrighted] dolls"). Thus, in *Knitwaves,* the court, viewing the sweaters in the eyes of "the average consumer of these sweaters," recognized that the differences in the sweaters did "little to lessen the viewer's overwhelming impression that the two [accused] sweaters are appropriations of the [copyrighted] sweaters." *Knitwaves, Inc. v. Lollytogs Limited,* 71 F.3d at 1004–1005.

■ At the outset, the parties sharply disagree as to whether color formed part of the copyrighted designs and whether color should be considered in determining substantial similarity. As previously explained, however, color forms part of the Blanket Stitch and the Primtive Patterns designs.

■ Furthermore, in applying the ordinary observer test, it is important to "consider the uses for which the design is intended, especially the scrutiny that observers will give to it as used." *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation,* 274 F.2d at 489; *In Design v. Lynch Knitting Mills, Inc.,* 689 F.Supp. at 179 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation,* 274 F.2d at 489); *see, e.g., Atari, Inc. v. North American Philips Consumer Electronics Corporation,* 672 F.2d 607, 619 (7th Cir.) (noting that video games, unlike an artist's painting, "appeal to an audience that is fairly undiscriminating insofar as their concern for the more subtle differences in artistic expression"), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Color to the female user of the copyrighted designs incorporated into the Primitive Patterns and the Blanket Stitch sweaters is something she will scrutinize in determining if the color in the sweaters complements her clothing. Additionally, both the Blanket Stitch and the Primitive Patterns designs were intended to accompany a color coordinated line of clothing.

This court's conclusion to view the selected color scheme as a component of the protectable expression in the Blanket Stitch and the Primtive Patterns designs is not without foundation in case law. *See Knitwaves, Inc. v. Lollytogs Limited,* 71 F.3d at 1004 (noting that Knitwaves' original contribution to copyrighted sweaters' designs consists of coordinating the design elements "with a 'fall' pallette of colors and with a 'shadow striped' ... or a four-paneled background[ ] and ... arranging all the design elements and colors into an original pattern for each sweater"); *Eden Toys, Inc. v. Marshall Field & Company,* 675 F.2d 498, 500–501 (2d Cir.1982) (noting differences as well as similarities in color of features such as eyes and items such as buttons and scarfs on two snowmen in course of affirming finding that two snowmen were not substantially similar); *Soptra Fabrics Corporation v. Stafford Knitting Mills, Inc.,* 490 F.2d 1092, 1094 (2d Cir.1974) ("color schemes were not to be entirely overlooked"); *Peter Pan Fabrics, Inc. v. Martin Weiner Corporation,* 274 F.2d at 489 (noting, in course of applying ordinary observer test, that "[b]oth designs have the same general color"); *The Prince Group v. MTS Products,* 967 F.Supp. at 126 (copyrighted design substantially similar to accused design in part because "color scheme is similar"); *Odegard, Inc. v. Costikyan Classic Carpets, Inc.,* 963 F.Supp. at 1338 (" '[a]sterisk' motifs, their arrangement, and the choice of color schemes are protectable elements" of copyrighted carpet design); *Cranston Print Works Company v. California Dimensions, Inc.,* 1990 WL 33580 at * 2–3 (S.D.N.Y. March 22, 1990) (collecting cases wherein color considered in determining substantial similarity of fabric designs); *Heyman v. Salle,* 743 F.Supp. 190, 193 (S.D.N.Y.1989) (noting that differences in color as well as other elements precluded summary judgment finding of substantial

similarity); *Lauratex Textile Corporation v. Allton Knitting Mills, Inc.,* 519 F.Supp. 730, 731 (S.D.N.Y.1981) ("lines, shapes and *colors* of the fabric designs ... are the same;" emphasis added); *Couleur International Limited v. Opulent Fabrics, Inc.,* 330 F.Supp. 152, 154 (S.D.N.Y.1971) ("defendant's fabrics of colors identical to plaintiff's is ... another factor leading to the conclusion that the aesthetic appeal of the fabrics is the same").

As these cases demonstrate, color may in certain situations constitute part of a copyrighted design and can therefore serve to support a finding of substantial similarity, *see, e.g., Saban Entertainment, Inc. v. 222 World Corporation,* 865 F.Supp. 1047, 1051–1052 (S.D.N.Y.1994), as well as a finding of no substantial similarity, *see, e.g., Kitchens of Sara Lee, Inc. v. Nifty Foods Corporation,* 266 F.2d 541, 545 (2d Cir.1959); *see generally Ann Howard Designs, L.P. v. Southern Frills, Inc.,* 992 F.Supp. 688, (S.D.N.Y.1998) (finding substantial similarity but noting differences in color).

Language to the contrary by the First Circuit in *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d at 610, quoting *Novelty Textile Mills, Inc. v. Joan Fabrics Corporation,* 558 F.2d 1090, 1094 n. 6 (2d Cir.1977), is distinguishable. First, the quoted language, to wit, " 'mere changes in the color scheme on the copied design would ordinarily not protect the defendant from a claim of copyright infringement,' " *Concrete Machinery, Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d at 610, is, when viewed in its original context, actually only the "writer's view" as opposed to a finding by the three judge panel. *Novelty Textile Mills, Inc. v. Joan Fabrics Corporation,* 558 F.2d at 1094 n. 6. Second, the quoted language in *Concrete Machinery* is dicta set forth in a string citation of cases. Third, the language is not couched in mandatory terms. Thus, it is only "ordinarily" as opposed to "always" that mere color changes will not preclude a substantial similarity finding.

In addition to color, courts examining the protected expression of copyrighted fabric or sweater designs and the accused works also compare similarities in: the arrangement and spacing of design elements, *The Prince Group v. MTS Products,* 967 F.Supp. at 126; *In Design v. Lynch Knitting Mills, Inc.,* 689 F.Supp. at 179 (size, shape and orientation of design elements in two sweaters differed thereby rendering a different overall appearance); the use and placement of particular patterns such as floral borders, *Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.,* 602 F.Supp. 151, 154 n. 2 (S.D.N.Y.1984); the application of a motif such as a felt squirrel stitched to the sweaters' surface, *Knitwaves, Inc. v. Lollytogs Limited,* 71 F.3d at 1004; the size of the elements, the choice of pattern and the repetitions, *The Prince Group v. MTS Products,* 967 F.Supp. at 126; *see also Peter Pan Fabrics, Inc. v. Martin Weiner Corporation,* 274 F.2d at 489 (noting that color scheme "and the arches, scrolls, rows of symbols, etc. on one resemble those on the other"); and the combination of certain elements and their placement in rows such as the use of triangle elements with parallel lines repeating in rows of different colors, *In Design v. Lauren Knitwear Corporation,* 782 F.Supp. at 831.

In the case at bar, the ordinary observer, viewing the protectable expression in the Blanket Stitch design, would inevitably conclude that Gillman unlawfully appropriated the protected design. In other words, the ordinary observer would recognize the Christie II sweater, in each of its color combinations, as having been appropriated from the protectable expression in the Blanket Stitch design. The differences in the color combinations do not, in this instance, avoid a finding of substantial similarity. The slight changes in the embroidery, the use of arrows as opposed to rectangles in one row and the placement and number of certain buttons do not obviate the fact that the overall similarities of the protectable expressions

in the copyrighted Blanket Stitch design and the Christie II sweater are substantially similar. The arrangement of the rows, the patterns within each row, the choice of a straight line or of a line of triangles, the size of the triangles, the width of the rows and the stitches employed are almost identical in the Blanket Stitch design and the Christie II sweater. The ordinary observer, unless she set out to detect these disparities and minor differences, would be disposed to overlook them and regard the aesthetic appeal as the same.

■ In contrast, the variations in the stitching, the marling of the yarn and the arrangement of the particular rows in the Primitive Patterns design and the Charro sweater are more pronounced.[39] In contrast to the Primitive Patterns design, the Charro sweater uses two large rows of open stitching not found in the Primitive Patterns design. The analogous row of open stitching in the Primitive Patterns design uses a different stitch to generate a more open and delicate look. The color combinations of the turquoise and chambray Charro sweaters also contrast sharply to the color combination used in the Primitive Patterns design. Moreover, the colors serve to enhance the differences in the patterns and stitches chosen and arranged in the rows. Viewed overall, the ordinary observer would regard the aesthetic appeal of the Charro sweater in the turquoise and chambray color combinations as distinct and not the same as the Primitive Patterns design.

■ On the other hand, a number of the rows in the Primitive Patterns design and the Charro sweater employ identical stitching arranged in the same manner and in the same width. In addition, the stone color combination in the Charro sweater and the selected colors in the Primitive Patterns design are strikingly similar. The differences in detail do not lessen the overall impression that the Charro sweater

in the stone color combination is an appropriation of the protectable expression in the Primitive Patterns design. As in *Knitwaves*, much of this impression is conveyed by the similar color schemes. *See Knitwaves, Inc. v. Lollytogs, Limited*, 71 F.3d at 1004–1005. For these and other reasons, the ordinary observer, viewing the protectable expression in the Primitive Patterns design embodied in the Segrets' sweater and the Charro sweater in the stone color combination from a distance of five to ten feet, would consider their aesthetic appeal as the same. It is the choice of color taken together with the similarities in the selection and arrangement of the patterns and the stitches used in the various rows which create, overall, the same aesthetic appeal to the ordinary observer. In addition, the ordinary observer would recognize the Charro sweater in the stone color combination as having been appropriated from the protectable expression in the Primitive Patterns design. Near identity is not required. In short, Segrets met its burden of proof of showing that the Charro sweater in the stone color combination and the protectable expression in the Primitive Patterns design are substantially similar under the ordinary observer test.

■ As a final matter, Gillman submits that Segrets' failure to offer into evidence the Blanket Stitch sweater prevents this court from making the necessary side by side comparison required to determine the substantial similarity of the fabric design and the Christie II sweater. Gillman contends that Segrets' omission violates Rule 1002, F.R.E., and is therefore fatal to its claim under Count I for copyright infringement of the Blanket Stitch design.

Under Rule 1003, F.R.E., however, "A duplicate is admissible to the same extent as an original unless (1) a genuine issue is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." F.R.E. 1003. Rule 1001(4),

---

**39.** As indicated *supra*, however, the similarities are not altogether absent.

F.R.E., defines a duplicate as "a counterpart produced ... by means of photography...."

The color photographs of the Blanket Stitch design accurately depict the design in complete detail. Consideration of the photographs in lieu of the Blanket Stitch sweater is not unfair. The color photographs of the front and the back of the Blanket Stitch sweater fully and accurately depict the design such that Gillman is not prejudiced by use of the photographs to determine substantial similarity. *See generally* 6 Jack B. Weinstein & Margaret A. Berger *Weinstein's Federal Evidence* § 1003.04[2] (1998) (discussing types of unfairness which create sufficient risk of prejudice to preclude admission of duplicate). Contrary to Gillman's argument, the photographs provided a meaningful opportunity for this court to determine substantial similarity. Accordingly, in such circumstances it is permissible to admit the photograph in lieu of the contents of the photograph, i.e., the Blanket Stitch sweater. *See, e.g., United States v. Stockton,* 968 F.2d 715, 719 (8th Cir.1992) (photographs of papers seized from residence properly admitted as duplicates to prove contents of papers); *United States v. Patten,* 826 F.2d 198, 199 (2d Cir.) (photographs of stolen checks in prosecution for possession of stolen checks properly admitted as duplicates), *cert. denied,* 484 U.S. 968, 108 S.Ct. 464, 98 L.Ed.2d 403 (1987).

Furthermore, this court doubts whether the Blanket Stitch design constitutes a writing, recording or equivalent thereof within the meaning of Rule 1001(1), F.R.E. Even assuming that the Blanket Stitch sweater constitutes an original writing, recording or equivalent thereof within the meaning of Rule 1001(1), F.R.E., however, the facts in the case at bar do not implicate

the concerns of the best evidence rule.[40] Gillman's reliance on *Seiler v. Lucasfilm,* 808 F.2d 1316 (9th Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987), is distinguishable on this basis. *See Takeall v. Pepsico, Inc.,* 809 F.Supp. 19, 20–21 (D.Md.1992) (distinguishing *Seiler* due to absence of evidence that party destroyed original in bad faith), *aff'g,* 14 F.3d 596, 1993 WL 509876 (4th Cir.1993), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994); *Data General Corporation v. Grumman Systems Support Corporation,* 803 F.Supp. 487, 491 (D.Mass.1992) (distinguishing *Seiler,* in part, because "there is no suggestion that Data General has destroyed evidence or has acted in bad faith"), *aff'g,* 36 F.3d 1147 (1st Cir.1994). There is no evidence that Segrets purposefully destroyed the original sweaters in bad faith. Indeed, this court had ample opportunity to view the Blanket Stitch sweater at trial.[41] For these and other reasons, this court had a meaningful opportunity to determine substantial similarity and Rule 1002, F.R.E., does not mandate the admission of the Blanket Stitch sweater as opposed to the admission of the photographic duplicates.

## II. *Wilfulness and Statutory Damages*

In lieu of establishing actual damages and profits, Segrets elected to recover statutory damages. Due to the oftentimes elusive nature of establishing actual damages, "Congress expressly provided copyright owners with the option of pursuing statutory damages." *Marvin Music Company v. BHC Limited Partnership,* 830 F.Supp. 651, 656 (D.Mass.1993). As amended, section 504(c)(1) of the Copyright Act permits an award of statutory damages "with respect to any one work ... in a sum of not less than $500 or more than $20,000 as the court considers just."

---

**40.** Rule 1002, F.R.E., is generally considered "a conventional restatement of the so-called best evidence rule." *Allstate Insurance Company v. Swann,* 27 F.3d 1539, 1543 (11th Cir.1994) (internal quotation marks omitted).

**41.** The opportunity of Segrets, Gillman and this court to view and examine the Blanket Stitch sweater at trial militates against a finding of unfairness. *See generally* 6 Jack B. Weinstein & Margaret A. Berger *Weinstein's Federal Evidence* § 1003.04[4] (1998).

17 U.S.C. § 504(c)(1). The Copyright Act therefore shifted the unit of damages recoverable under the Copyright Act of 1909 from a calculation based on each infringement to a calculation based on each work infringed. *Gamma Audio & Video, Inc. v. Ean–Chea*, 11 F.3d 1106, 1116 (1st Cir. 1993). In light of this court's finding of infringement of the copyrighted Blanket Stitch design and the copyrighted Primitive Patterns design, Segrets is entitled to two awards of statutory damages based on each of these infringed works.[42]

■■■ In addition, in the event Segrets sustains its burden of proving that Gillman's "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000." 17 U.S.C. § 504(c)(2). Conversely, where Gillman sustains its burden that it "was not aware and had no reason to believe that [its] acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." 17 U.S.C. § 504(c)(2). In order to receive the lowered minimum of $200, the infringer must prove both a subjective good faith belief as well as an objectively reasonable good faith belief. *Childress v. Taylor*, 798 F.Supp. 981, 994 (S.D.N.Y.1992); *see generally* 4 Melville B. Nimmer & David Nimmer *Nimmer on Copyright* § 14.04[B][2][a] (1998).

■■■ Gillman fails to sustain its burden. Moreover, in light of section 401(d) of the Copyright Act, the statutory minimum does not apply at least with respect to the Primitive Patterns sweater wherein the copyright notice, affixed to give reasonable notice, contains the required year of publication.[43] *See Langman Fabrics v. Samsung America, Inc.*, 967 F.Supp. 131, 135 (S.D.N.Y.1997) (fabric designs are considered "writings" requiring year of first publication to comply with section 401(b)(2)). Finally, due to the wilfulness of Gillman's conduct, this court would not assess damages below the $500 minimum thereby rendering moot the issue of the applicability of the reduced statutory minimum amount of $200.

■■■ With respect to the statutory maximum, Segrets met its burden of establishing wilfulness both with respect to the Blanket Stitch and the Primitive Patterns copyrighted works. Wilfulness within the meaning of § 504(c) exists "if a defendant knew that his or her actions constituted an infringement." *Peer International Corporation v. Luna Records, Inc.*, 887 F.Supp. 560, 568 (S.D.N.Y.1995); *accord Twin Peaks Productions, Inc. v. Publications International, Limited*, 996 F.2d 1366, 1382 ("standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility");[44] *Central Point Software, Inc. v. Global Software & Accessories*, 880 F.Supp. 957, 967 (E.D.N.Y.1995); *see* 4 Melville B. Nimmer & David Nimmer *Nimmer on Copyright* § 14.04[B][3] (1998) (" 'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement"). An infringer's conduct may infer such knowledge. *See Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963

**42.** Thus, contrary to Segrets' proposed findings, it is not necessary to separate the findings of wilfulness as to the Christie I sweater versus the Christie II sweater.

**43.** Section 401(d) provides that:
If a notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringe-

ment in mitigation of actual or statutory damages, except as provided in the last sentence of section 504(c).
17 U.S.C. § 401(d).

**44.** Because this court finds ample evidence that Gillman acted with knowledge that its conduct was an infringement, this court does not rely on the standard of recklessness to support an enhanced statutory award and the amount of such an award.

F.Supp. at 1341 ("[k]nowledge of infringement can be constructive rather than actual, and can be inferred from the infringer's conduct"); *Peer International Corporation v. Luna Records, Inc.*, 887 F.Supp. at 568.

■ Turning to the Blanket Stitch design, Gillman's Christie I sweater was an exact copy of the copyrighted work except for the color.[45] *See Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.*, 602 F.Supp. at 155 ("high degree of similarity between the two designs" served as basis for finding of wilfulness). Gillman purchased the Blanket Stitch sweater which had an affixed copyright notice along the inside side seam. Segrets notified Gillman by letter of its infringing conduct both with respect to the Christie I and the Christie II sweaters. Segrets repeatedly informed Gillman by letter that continued sales of the Christie II sweater would constitute wilful infringement subjecting Gillman to increased damages. Notwithstanding such notice, Gillman continued to sell the Christie II sweater. "[E]vidence that notice had been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness." *Video Views, Inc. v. Studio 21, Limited*, 925 F.2d 1010, 1021 (7th Cir.), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

Any alleged belief on the part of Gillman that its conduct was not infringing was not made in good faith and was not objectively reasonable. Gillman itself sold the Christie II sweater through a catalogue picturing the Christie I sweater. Nor did it advise customers of the discrepancy. Such conduct implies that Gillman viewed the Christie II sweater as substantially similar to the Christie I sweater, a sweater which Gillman knew was an exact copy of the Blanket Stitch design albeit with the exception of its color. Customers did not complain when Gillman shipped them the Christie II sweater in lieu of the pictured

Christie I sweater thereby further evidencing to Gillman the substantial similarity of the two sweaters.

Although Gillman made certain changes to the Christie I sweater, it nevertheless succeeded in its desire to retain the overall look and feel of the Christie I sweater in the Christie II sweater. *See Knitwaves, Inc. v. Lollytogs, Limited*, 71 F.3d at 1011 (infringer's "admission that it set out to create designs having the same 'look' and 'feel' as Knitwaves' sweaters" supported finding of wilfulness). William Gillman, who, according to Chang, even negotiated pennies, would not have expended the approximate $10,000 to change the Christie I sweater unless he viewed it as an infringement of the Blanket Stitch design. The similarities between the Blanket Stitch design and the Christie I sweater are also readily apparent such that any reasonable fact finder would view them as substantially similar.

Finally, Gillman purchased the Blanket Stitch sweater and sent it to its overseas manufacturer to use as a model for the Christie I and the Christie II sweaters. Chang's revisions to the Christie I sweater, approved by William Gillman, did not materially or even significantly alter the overall design of the Christie I sweater.

In sum, this court finds that Gillman intentionally and wilfully copied the Blanket Stitch design. It acted with knowledge that its conduct constituted an infringement of Segrets' copyrighted design.

Gillman also acted wilfully with respect to the Primitive Patterns copyrighted work. First and foremost, Segrets notified Gillman of the infringement yet Gillman proceeded to sell the Charro sweaters in house. *See Video Views, Inc. v. Studio 21, Limited*, 925 F.2d at 1020–1021. The Charro sweater in the stone color combination is strikingly similar to the Primitive Patterns design. Gillman's continued sales of the substantially similar Charro

---

45. As previously noted, Segrets has the exclusive right to copy the Blanket Stitch design and to incorporate the design into derivative works.

sweater in the stone color combination after Segrets notified Gillman of its infringing conduct[46] provides evidence that it knew that its conduct constituted copyright infringement.

Gillman's actions were not in good faith or objectively reasonable. Smith purchased the Primitive Patterns sweater with the copyright notice affixed to the inside side seam. Her extensive use of the sweater to create the Charro sweater and her constant contact with Gillman's overseas manufacturer infer that she knew of the copyright notice notwithstanding her testimony to the contrary. She then proceeded to use identical stitches arranged in rows of the same width and, in places, the same marling together with virtually the same color combination as in the copyrighted Primitive Patterns sweater. She also sent this sweater to Gillman's overseas manufacturer as a sample. Furthermore, William Gillman's testimony intimating that Smith independently created the Charro sweater because he saw her drawing the pattern from a book and thus did not believe that the Charro sweater violated the Primitive Patterns copyright was not credible. *See Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. at 1341 (the defendants' testimony of independent creation "not credible" thereby justifying finding of wilfulness).

This court therefore concludes that Gillman intentionally and wilfully copied the Primitive Patterns design in the Charro sweater in the stone color combination. As with the Blanket Stitch design, Gillman acted with knowledge that its conduct constituted an infringement of the protectable expression in Segrets' copyrighted design.

In sum, the allowable statutory maximum is increased to $100,000 with respect to each copyrighted work.

The precise amount of statutory damages within the range of $500 to $100,000 lies within this court's discretion. *See Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Company, Inc.*, 74 F.3d 488, 496 (4th Cir.) (jury "given broad discretion to award up to $100,000 for each work copied" if presented with evidence of wilfulness), *cert. denied*, 519 U.S. 809, 117 S.Ct. 53, 136 L.Ed.2d 16 (1996); *Lauratex Textile Corporation v. Allton Knitting Mills, Inc.*, 519 F.Supp. at 733 (court has "broad discretionary power" to make statutory damages award). The amount of an award, however, should "further the objectives of the Copyright Act, namely, to compensate copyright owners for a past infringement and to deter future infringement." *Warner Brothers, Inc. v. Dae Rim Trading, Inc.*, 677 F.Supp. 740, 769 (S.D.N.Y.1988), *aff'g in part and rev'd in part on other grounds*, 877 F.2d 1120 (2d Cir.1989); *Video Cafe, Inc. v. de Tal*, 961 F.Supp. 23, 26 (D.P.R.1997) (noting statutory damages award serves "both compensatory and punitive purposes"); *Lauratex Textile Corporation v. Allton Knitting Mills, Inc.*, 519 F.Supp. at 733 (courts have discretion to make statutory damages award to serve dual purpose of Copyright Act "to compensate copyright owners and to provide deterrent for would-be infringers").

In addition to the foregoing, relevant factors to consider include: "(1) expenses saved and profits reaped by the defendant, (2) revenues lost by the plaintiffs, (3) the deterrent value of the award, and (4) whether the infringement was wilful or innocent."[47] *Polygram International Publishing, Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314, 1335 (D.Mass.1994); *accord Warner Brothers, Inc. v. Dae Rim Trading, Inc.*, 677 F.Supp. at 769 (citing same factors); *Major Bob Music v.*

---

**46.** William Gillman testified that he became aware of Segrets' copyright infringement claim with respect to the Charro sweater in the fall of 1994.

**47.** See footnote number 25.

*Stubbs,* 851 F.Supp. 475, 481 (S.D.Ga. 1994).

■ The absence of an injury to Segrets or significant profits to Gillman, however, does not necessarily preclude a statutory award "to sanction and vindicate the statutory policy." *F.W. Woolworth Company v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1955); *see, e.g., Odegard, Inc. v. Costikyan Classic Carpets, Inc.,* 963 F.Supp. at 1341 (statutory award of $25,000 appropriate notwithstanding absence of lost profits by the plaintiffs or financial benefits to the defendant).

> A rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems just, impose a liability within the statutory limits to sanction and vindicate the statutory policy.

*F.W. Woolworth Company v. Contemporary Arts, Inc.,* 344 U.S. at 233, 73 S.Ct. at 225.

In the case at bar, the deterrent value of an award and the wilfulness of the violations justify a statutory award notwithstanding the minimal amount of Gillman's profits and the absence of revenues lost by Segrets. *See Marvin Music Company v. BHC Limited Partnership,* 830 F.Supp. 651, 656 (D.Mass.1993) ("courts often consider two factors—the award's deterrent value and the wilful nature of defendants' infringement"); *International Korwin*

*Corporation v. Kowalczyk,* 665 F.Supp. 652, 658 (N.D.Ill.1987) ("court should primarily focus upon two factors: the willfulness of the defendant's conduct, and the deterrent value of the sanction imposed"), *aff'g,* 855 F.2d 375 (7th Cir.1988); *see, e.g., Lauratex Textile Corporation v. Allton Knitting Mills, Inc.,* 519 F.Supp. at 733 (awarding $40,000 statutory damages under prior § 504(c)(2) where maximum award for wilful infringement was $50,000, even though actual damages were only $5,177, due to the defendant's wilfulness).

As previously noted, Gillman wilfully violated the copyright laws, in part, by continuing to sell the Christie II sweater and the Charro sweater in the stone color combination after being notified that its conduct was infringing Segrets' copyrighted Blanket Stitch and Primitive Patterns designs. In addition to this and other previously described wilfulness, Gillman repeated its infringing conduct when it set out to copy and sell the Charro sweater in the stone color combination. This repetitious conduct at a time when Gillman was already engaged in copyright infringement litigation with the same party over the Christie I and II sweaters evidences that Gillman wilfully and intentionally ignored the copyright laws.[48]

Gillman's attitude that it could succeed in avoiding responsibility for its infringing conduct is further exemplified by its attempts to discourage Segrets from proceeding forward with this lawsuit. In May 1994 Gillman refused to comply with Segrets' reasonable request to view a copy of the redesigned Christie I sweater before Gillman began selling the potentially infringing sweater. In fact, Gillman characterized any agreement on the part of Gillman to provide Segrets with a sample of the Christie II sweater as a possible violation of the antitrust laws. In August 1994 Gillman's counsel described Segrets' attempt to pursue its infringement claim as "frivolous and sanctionable" even though

---

48. Even if this court considered the excluded evidence of another lawsuit, such evidence would not result in a different award in light of the already existing repetitious behavior.

the Christie II sweater differed in only minor respects from the Blanket Stitch design. One month later, Gillman's counsel warned Segrets' counsel that "Segrets' cost of litigating these claims are likely to far exceed any potential benefit that might be gained" and that "Gillman will make no offer to settle this claim." Taken together, these efforts appear designed to discourage Segrets from enforcing its rights in an effort to avoid compliance with the copyright laws. "[C]ourts have repeatedly emphasized that defendants must not be able to sneer in the face of copyright owners and copyright laws. Rather, defendants must 'be put on notice that it costs less to obey the copyright laws than to violate them.'" *International Korwin Corporation v. Kowalczyk*, 665 F.Supp. at 659; *see also Video Views, Inc. v. Studio 21, Limited*, 925 F.2d at 1021 ("[i]ncreased statutory damages may be necessary in a particular case to prove that it 'costs less to obey the copyright laws than to violate them'").

■■■■■ Statutory damages should nevertheless "bear some relationship to actual damages suffered." [49] *Peer International Corporation v. Luna Records, Inc.*, 887 F.Supp. 560, 568 (S.D.N.Y.1995); *RSO Records, Inc. v. Peri*, 596 F.Supp. 849, 862 (S.D.N.Y.1984) ("assessed statutory damages should bear some relation to actual damages suffered"). It is also true that statutory damages are "not intended to provide the plaintiff with a windfall recovery." *Warner Brothers, Inc. v. Dae Rim Trading, Inc.*, 677 F.Supp. at 769.

■■■■■ Gillman adequately documented its overhead expenses. Although Gillman did not provide original receipts or invoices for all of the underlying expenses, it nevertheless provided a summary which this court has no reason to believe was inaccurate.[50] Gillman's expenses and costs must, of course, relate to the infringing work. *In Design v. Lauren Knitwear Corporation*, 782 F.Supp. 824, 832 (S.D.N.Y.1991) (involving calculation of the defendant's profits under section 504(b)). Stated otherwise, "Overhead which does not assist in the production of the infringement should not be credited to the infringer." *Sammons v. Colonial Press*, 126 F.2d 341, 349 (1st Cir.1942) (involving calculation of actual damages under prior statute). Gillman's suggested means of calculating overhead in proportion to the number of infringing sales versus the percentage of total sales is an acceptable method for estimating overhead costs.[51] *See Sammons v. Colonial Press*, 126 F.2d at 349; *Dolori Fabrics, Inc. v. The Limited, Inc.*, 662 F.Supp. 1347, 1356 (S.D.N.Y. 1987). Overhead therefore totaled approximately $16,183 for the Christie I and II sweaters and approximately $5,474 (41% × $13,350) for the Charro sweater in the stone color combination.

As previously explained,[52] however, adequately documented commissions for the

**49.** Any evidence of revenues lost by Segrets was not convincing. Although Segrets and Gillman had an overlapping customer base, this court finds that Gillman primarily sold garments to lower end retail stores at different times. Gillman also sold the Christie II sweater and the Charro sweater in the stone color combination at lower wholesale prices. Accordingly, this court focuses upon Gillman's profits and any expenses saved.

**50.** At trial Segrets objected to the admission of exhibits I–1 and I–2 solely on the basis that Segrets asked for financial information which was never produced even though Segrets' counsel acknowledged that he had seen exhibit I–1 prior to trial. Hearing no other basis for an objection at the time, this court admitted the exhibits.

**51.** Inasmuch as Segrets did not challenge Gillman's approach on the basis that the percentage of infringing sweaters was minuscule in comparison to Gillman's total business, this court will not address this argument *sua sponte*. As a collateral matter, William Gillman testified that exhibit I was a business record. (Day II, p. 114). Segrets' objection that "there was no foundation provided by Mr. Gillman that these [referring to exhibit I] were all business records" and that he "simply referred to certain of the records" (Day III, p. 33) is therefore misplaced.

**52.** See footnote number 30.

Christie II sweater total $4,025 as opposed to the $9,282 sought by Gillman. The evidence also fails to distinguish between commissions for sales of the Charro sweater in the stone color combination versus the Charro sweater in other color combinations. Excluding factor fees and trade discounts for the Christie II sweater,[53] this court finds Gillman's profits for the Christie II sweater include net sales of $119,291, direct costs of $88,362 ($98,362 minus the $10,000 redesign cost), commissions of $4,025 and overhead of $16,183. Net profit for the Christie II sweater therefore totals $10,721.

Excluding factor fees, trade discounts and inadequately documented sales commissions,[54] this court finds Gillman's profits for the Charro sweater include net sales of $100,190, direct costs of $74,527 and overhead of $13,350. Using these figures yields a net profit for the Charro sweater in an amount of $12,313. Roughly estimating the net profit attributable to the sale of the Charro sweater in the stone color combination as 41% of this figure results in a net profit on the infringing sales of the Charro sweater in an amount of $5,048.

■ A statutory award limited to the total of Gillman's profits, however, would not deter future infringing conduct on the part of Gillman or others. In addition, Gillman's wilfulness also justifies a statutory award in excess of Gillman's profits. This court, in its discretion, therefore finds a statutory damages award of $37,000 with respect to the copyrighted Blanket Stitch work and $30,000 with respect to the copy-

righted Primitive Patterns work resulting in a total award of $67,000 appropriate.[55]

## III.   Attorneys' Fees

■ Section 505 of the Act permits an award of reasonable attorneys' fees to prevailing parties not as a matter of course but, rather, "only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994); *Knitwaves, Inc. v. Lollytogs, Limited*, 71 F.3d at 1011 ("[a]ttorney's fees are not to be awarded automatically to a prevailing party ... but 'only as a matter of the court's discretion' "); *Peer International Corporation v. Luna Records, Inc.*, 887 F.Supp. at 570 (quoting *Fogerty*). Segrets achieved a high degree of success in this case and, unquestionably, is a prevailing party within the meaning of section 505.

This court's equitable discretion should be exercised "with the goal of vindicating the overriding purpose of the Copyright Act: to encourage the production of original literary, artistic, and musical expression for the public good." *Lotus Development Corporation v. Borland International, Inc.*, 140 F.3d 70, 72–73 (1st Cir.1998) (discussing Fogerty). The Court in Fogerty also identified the following list of noninclusive factors for courts to consider: " 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in some cases to advance considerations of compensation and deterrence.' " *Fogerty v. Fantasy, Inc.*, 510 U.S. at 534 n. 19, 114 S.Ct. 1023 (quoting *Lieb v. Topstone In-*

**53.** See footnote number 30.

**54.** See footnote number 30.

**55.** The greater amount of statutory damages awarded for infringement of the copyrighted Blanket Stitch work is due, in part, to the larger amount of Gillman's net profit.

As a separate matter, Segrets' amended complaint does not expressly request an award of prejudgment interest. Likewise, Segrets' proposed findings do not mention

prejudgement interest and limit the requested relief to statutory damages and attorneys' fees. Because statutory damages and attorneys' fees are sufficient to serve the legitimate goals of the Copyright Act, an award of prejudgement interest is unnecessary. *See In Design v. Lauren Knitwear Corporation*, 782 F.Supp. at 837 (denying prejudgment interest where the plaintiff's recovery provided adequate compensation for the plaintiff and sufficient deterrence to the defendants thereby serving goals of the Copyright Act).

dustries, Inc., 788 F.2d 151, 156 (3d Cir. 1986)).

In light of the wilfulness of Gillman's infringement and the need to deter Gillman and others from future infringement, an award of reasonable attorneys' fees to Segrets is appropriate. *See, e.g., Peer International Corporation v. Luna Records, Inc.*, 887 F.Supp. at 570 (noting factors cited in *Fogerty* and awarding fees due to finding of wilful infringement continuing for months after initiation of the action and the need to deter the defendants from future infringement); *A & M Records, Inc. v. Abdallah*, 948 F.Supp. 1449, 1460 (C.D.Cal.1996) (awarding fees to deter others from violating the Copyright Act).

In addition, Gillman's claim that the Christie I and II sweaters did not infringe the Blanket Stitch design was objectively unreasonable. The Christie I sweater was an exact copy of the Blanket Stitch design except for the color. The Christie II sweater differed from the original sweater in only minor respects. *Cf. Roeslin, III v. District of Columbia*, 921 F.Supp. 793, 800 (D.D.C.1995) (noting that "[t]he defendant did not act unreasonably in defending this case" as a basis for not awarding the plaintiff fees).

An award of a reasonable attorneys' fee in this case also serves the goal of encouraging parties to litigate meritorious infringement claims. *See Fogerty v. Fantasy, Inc.*, 510 U.S. at 527, 114 S.Ct. 1023. Segrets' claims of infringement are, without doubt, meritorious.

An award of a reasonable attorneys' fees is therefore proper. This court emphasizes, however, that the fee amount must be reasonable. In addition, Segrets should fully document its fees. *See Video Cafe, Inc. v. de Tal*, 961 F.Supp. 23, 27–28 (D.P.R.1997) (denying attorneys' fee award due to lack of documentation).

Absent a stipulation as to the amount, Segrets should file an affidavit detailing and documenting the amount of its attorneys' fees, as well as a motion and supporting brief requesting the amount sought and setting forth the law with respect to the calculation of such a fee. Absent a stipulation, Gillman will be responsible for the attorneys' fees necessary for Segrets to justify the reasonableness of the amount of its fee request. In its request, Segrets should therefore include the amount of attorneys' fees spent in preparing the motion, supporting brief, the affidavit and any additional, supporting documentation.

### CONCLUSION

In sum, Segrets is entitled to $37,000 in statutory damages under Count I and $30,000 in statutory damages under Count II. Attorneys' fees are appropriate and, absent a stipulation or agreement between the parties, Segrets shall submit adequate documentation for a reasonable attorneys' fee award on or before September 21, 1998, and advise this court as to the status of counts III through VI on or before August 21, 1998.